SM

[If you need additic    1:21-cv-04465        nce that section.]
Judge Steven C. Seeger
Magistrate Judge Jeffrey Cummings
RANDOM

Robert E. Jackson       )

       Plaintiff       )

       )

       v.        )

Federal Home Loan Bank of Chicago    )

       Defendant       )

**United States District Court**
**Northern District of Illinois**

# FILED

## AUG 23 2021 cm

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

## COMPLAINT

Wrongful termination, based on retaliation for the rescission of the March 2016 written disciplinary action, as well as my manager's (Sharon Schweiters) discomfort with me being an African American male (see Exhibit: EEOC Response Rebuttal).

8/23/21

Robert E Jackson

EEOC Form 161-B (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**NOTICE OF RIGHT TO SUE** *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Robert Jackson**<br>c/o Gary Martoccio<br>**SPIELBERGER LAW GROUP**<br>**4890 W. Kennedy Blvd, Suite 950**<br>**Tampa, FL 33609** | From: **Chicago District Office**<br>**230 S. Dearborn**<br>**Suite 1866**<br>**Chicago, IL 60604** |

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **440-2020-04187** | **Daniel Gajda,**<br>**Investigator** | **(312) 872-9668** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Julianne Bowman/msd*       5/25/2021

**Julianne Bowman,**
**District Director**       *(Date Issued)*

Enclosures(s)

CC:

**FEDERAL HOME LOAN OF CHICAGO**
c/o Jennifer Schilling
**Littler Mendelson, P.C.**
**321 N. Clark St., Suite 1000**
**Chicago, IL 60654**

# EEOC Response Rebuttal

### Performance

In the Charge of Discrimination Statement that I submitted to the EEOC, I stated that Sharon Schweiters had issued an unwarranted written disciplinary action to me. That is the written disciplinary action issued on March 21, 2016, which is mentioned in the statement from the respondent in the Performance section.

On March 21, 2016, I attended a meeting with Sharon Schweiters and Anthony (Tony) Calkins. At which time, I was issued a written disciplinary action. The written disciplinary action contained numerous falsified allegations of unacceptable/less than satisfactory performance issues. None of the allegations were true. Therefore, I informed Mr. Calkins and Ms. Schweiters that I would not be signing the document. At which time, both of them visibly showed that they were clearly upset by me disagreeing to sign the document. And, at that point they tried to get me to acquiesce by telling me that my signature was not an acknowledgement of any wrong doing on my part. I did not submit to the pressure that they were placing on me. And, the document was never signed.

After the meeting, I contacted Margaret Poznar (Human Resources), regarding the unwarranted written disciplinary action. She requested that I submit documentation that verify that the allegations were untrue. I then gathered the documentation, which included emails from internal and external stakeholders with whom I interacted in the performance of my job, as well as an email from Mr. Calkins thanking me for my consistent production (number of reviews and responses) which included the first page of a production report that showed the I was the number one QC Analyst at that point and had been for three of the previous four months (one of those four months I was number 2).

On March 28, 2016, I was approached by Beth Shapiro-Kopin, (Ms. Schweiters' and Mr. Calkins' supervisor), while I was sitting at my desk working. She proceeded to try to pressure me into signing the written disciplinary action. Again, I did not sign the document.

Due to the pressure that I was feeling, based what I perceived to be harassment which Ms. Schweiters, Mr. Calkins, and Ms. Shapiro-Kopin were placing on me, I, once again, contacted Ms. Poznar and requested a meeting. I have submitted the transcript of the voicemail message which I received from Ms. Poznar on March 28, 2016, regarding meeting with her, in response to my voicemail message, as verification of these actions. Ms. Poznar and I met the following week. At which time, Ms.Poznar informed me that she would look further into the situation. At the end of that same week, Ms. Schweiters and Mr. Calkins called me in for a meeting regarding the unwarranted written disciplinary action. Apparently, Ms. Poznar's investigation verified that all of the allegations on the written disciplinary action were falsified. Due to the fact that, Mr. Calkins started the meeting by stating, "Robert, don't worry about signing the write up. It never happened." Therefore, as stated in the EEOC Charge of Discrimination statement, the written disciplinary action was unwarranted and rescinded by the FHLBC. Also, the disciplinary action was never entered into my personnel file. Therefore, I was not under any disciplinary action. And, the subpar performance allegations directed toward me were false. As verification of this, I have submitted a copy of the written disciplinary action and my 2016 Performance Appraisal, which was

completed by Ms. Schweiters (note that there is no mention of any written and/or verbal disciplinary action mentioned in the 2016 Performance Appraisal). As additional support of the written disciplinary action being unwarranted and the allegations being falsified, note that in the 2016 Performance Appraisal, Ms. Schweiters gave me a glowing review.

It is FHLBC policy that when a person is undergoing written disciplinary action, that person is ineligible for an Annual Bonus and/or salary increase during the annual period of which the written disciplinary action was enforced. And, I did receive my Annual Bonus (see attached March 2017 bank statement) and salary increase for 2016, which would not have occurred, if the March 21, 2016 had been in effect ("…It never happened.").

As I stated previously, it is FHLBC policy that when a person is undergoing written disciplinary action, that person is ineligible for an Annual Bonus and/or salary increase during the annual period of which the written disciplinary action was enforced. Therefore, as verification that I was not subject to any written disciplinary action from January of 2016 through the end of my employment with FHLBC, I have attached the my bank statement from March 2017 (verification of my receipt of my 2016 Annual Bonus), paystubs from the 2017 and 2018 Annual Bonuses which I received, as well as my January 30, 2019 and February 15, 2019 Paystubs (note that my annual salary from 2018 to 2019 increased). Additional, "Meets Expectations" is defined as *Overall performance is strong and consistently matches others with comparable levels of responsibility. Successfully accomplishes objectives,* on the Performance Appraisal form. And, I have never received a rating of anything less than Meets Expectations in any of my annual Performance Appraisals from Ms. Schweiters.

In response to the Time Management and lack of Communication Skills allegations in the Performance Section of the statement from the respondent, I have submitted numerous emails, from internal and external stakeholders, that attest to the fact that I was accurate and timely in my responses to any questions and/or requests, as well as being professional, clear, and concise in all of my internal and external communications in person, by telephone, and/or electronically. Note that some of these emails regarding my communication and response time are from Ms. Schweiters, herself. Please, note that I have included emails from Ms. Schweiters, in which she requested my assistance and deferred to my expertise, which is in direct contradiction to the Ms. Schweiters /FHLBC statement that my performance was less than adequate. In addition, in my 2017 Performance Appraisal, Ms. Schweiters stated, "Robert is a subject matter expert on government loans. Stakeholders across the bank rely on Robert to efficiently and accurately provide insight and assistance." She also stated, "Robert has been the facilitator for reviewer meetings held on a quarterly basis. These meetings have allowed the reviewers to discuss process efficiencies, underwriting questions, and other ideas." Another statement made by Ms. Schweiters in that Performance appraisal is, "Robert meets manager expectations in the role of Senior Quality Control Analyst. He adapts to the ever-changing pipeline and works effectively to meet deadlines.", which contradicts the time management assertions. Additionally, the fact that I was tasked, by Ms. Schweiters, with the responsibility of facilitating the quarterly QC Analysts meetings (see 2017 Performance Appraisal), in conjunction with my Bachelor of Science in Business Administration (Finance) Degree from the University of Dayton, where I was a Dean's List/honor student (see attached B.A. Degree and Dean's List Certificate), is in direct contradiction to Ms. Schweiters' assertation that I lacked the communications skills crucial to maintain a cohesive team. Therefore, based on the statements from Ms. Schweiters, noted in the 2016 & 2017 Performance Appraisals, the emails, and the monetary compensation which I received from

the FHLBC, these statements are in direct contradiction to Ms. Schweiters /FHLBC statement that I lacked communication skills, professionalism, and had a negative effect on team moral.

## 2020 FMLA (Family Medical Leave Act) Leave

In March of 2018, I was the victim of a Hit & Run, which caused me to be on Short-Term Disability leave from March 14, 2018 to April 24 2018. During the process of obtaining the leave, I informed Ms. Schweiters of my disability (Charcot-Marie-Tooth syndrome).

On January 09, 2020, I suffered two disability related falls, which reaggravated the leg injuries from the previously mentioned Hit & Run.

On the morning of January 13, 2020, I notified Ms. Schweiters and Ashley Carrington (Team Lead) of my injury, via text message. When Ms. Schweiters reached out to me, by telephone, I explained that I was in a great deal of pain and requested a Short-Term Medical Leave for recovery.

On January 21, 2020, I received a telephone call from Charmayne Beverly (Human Resources) and Sharon Schweiters, who were calling from Ms. Beverly's office. Ms. Beverly informed me that I would be required to submit a note from my doctor, in order to be permitted to return to work. I informed Ms. Beverly that I would inform them of the date of my doctor's appointment, as soon as it was arranged. A few notable things occurred during the call. First, when informing me of the requirement of obtaining a note from my doctor, Ms. Beverly stated, "If you return to work...," At this point, I asked, "What do you mean, if I return to work? Is there something going on that I need to know about?" Ms. Beverly then recanted by saying, "I mean, when you return to work." Second, toward the end of the call, Ms. Beverly told me that she was going to put me on hold, in order to discuss something with Ms. Schweiters. I am not sure as to the reason that FHLBC Human Resources and management would decide to keep anything involving my Short-Term Disability Leave from me, as I have a right to be informed of all matters pertaining to my leave. Upon resumption of the call, Ms. Beverly informed me that I would be required to call Ms.. Schweiters or Ms. Carrington on a daily basis to inform them that I would not be in the office. This seemed questionable, due to the fact that I was not required to do that at any period, during the 2018 leave. Also notable was the fact that Ms. Schweiters never spoke, during the call.

Overnight on the evening of January 22, I was undergoing extreme pain, which kept me awake the entire night, this left me unable to call in on the morning of January 23, 2020. When then pain subsided a little, I informed Ms. Schweiters (voicemail) that my doctor's appointment was scheduled for January 30, 2020. After which, I discovered an email from Ms. Carrington (see attached email). The email pointed out that I had not called in that morning, and reiterated that I must keep calling in, every day. At that point, I called Ms. Carrington and reiterated that I was in extreme pain. And, that I felt the everyday telephone call requirement was not actually required. I also told her that, I didn't understand why Ms. Schweiters was going out of her way to make this already extremely difficult situation even more difficult for me. Note that, I was in extreme pain at the time of the call. And, that the nature of the call actually exacerbated the amount of pain that I was already undergoing, due to stress. Therefore, due to the amount of pain that I was in, I raised my voice. However, I did not use profanity at any time during the conversation. In response to me stating that the requirement was made up just for me, Ms. Carrington contacted Human Resources. Subsequently, Ms. Carrington sent an email to me stating that I was not required to

call in every day (see attached email). Note that the fact that the requirement for me to call based upon Ms. Carrington's email, was found to not be required, due to not being true, and was never addressed. The email also stated that, following the doctor's appointment, I should follow up with her and Ms. Schweiters. On January 30, 2020, I was seen by my doctor. Based on the pressure from the initial telephone from Ms. Beverly and Ms. Schweiters ("…*If* you return to work…" and the discussion regarding me, which I was not party to), that resulted in the communication of the made up rule regarding calling in (which only applied to me), the email from Ms. Carrington, as well as the telephone call with Ms. Carrington, I felt that it was imperative that I get the doctor's note to FHLBC without delay. However, due to getting down the four stories from my condominium (a historical building with no elevator), to the car, the cold temperature, and the examination by the doctor (standing, walking, stretching, prodding, x-rays, etc.), I was in too much pain to deliver the doctor's note the FHLB in person. However, due to the pressure for urgency that was being placed on me to deliver the doctor's note, by Ms. Schweiters , Ms. Beverly, and Ms. Carrington, in conjunction with the extreme pain which I was undergoing at that point, I decided that it would be more prudent to have Letitia Jackson (sister) deliver the doctor's note rather than to send the note via the US Postal Service. So, Ms. Jackson delivered the note for me (see attached notarized statement from Letitia Jackson). Please note that, prior to this, I had never been in violation of any FHLBC policies regarding my employee security badge.

On the morning of January 31, 2020, I received a telephone call from Ms. Beverly, Ms. Schweiters, and Ms. Carrington. Note that I was still in pain, from the physical examination of the previous Day. Ms. Beverly started the call by berating me for violating FHLBC's security policy, due to the fact that Ms. Jackson gained entry by using my security badge. Ms. Beverly then proceeded to tell me that I had not complied with the mandate that I inform them of the results of the doctor's appointment. At this time, I asked, "If you're aware that my sister dropped off the doctor's note, then you can't say that I did not inform you of the results." At this time, Ms. Beverly started speaking in an even more negative and condescending tone than before I asked the question. This intensified some of my previous concerns about this whole encounter, from the initial telephone call that occurred on January 21, 2020 from Ms. Beverly and Ms. Schweiters, through that moment. So, I said, "By the way, you never did tell me why you said "If I return to work,…" and you didn't tell me why you and Sharon put me on hold." At this point, Ms. Beverly denied making the "If I return to work" comment and denied that placing me on hold ever happened. Once, again, Ms. Schweiters did not say anything, which added to my stress. Admittedly I raised my voice and told Ms. Beverly that I would no longer be dealing with her and, to have another Human Resources representative contact me. She grudgingly agreed and we ended the call. Please note that I did not use profanity at any point during the call.

## Termination

On the afternoon of January 31, 2020, I received a telephone call from Darren Inkman (Ms. Schweiters's supervisor) & Ms. Beverly. At this time, Mr. Inkman informed me that my employment had been terminated. I asked Mr. Inkman, if I was being terminated for falling down. He stated that I was being terminated for my unprofessional behavior and violating the security policy. Note that I was not given the opportunity to present my side of the story to Mr. Inkman. Please notice that my inquiry to Mr. Inkman, regarding me being terminated for falling down, was due to me being subject to discrimination, based on my disability. The falls, which reaggravated the initial injury, were due to my disability. Based on this, my disability was a factor in the

termination of my employment.  Also, note that I did not raise my voice or use profanity at any point during the call.  Additionally, my request to speak with another Human Resources person (made during the previous call) never happened.

**Preferential Treatment**

Like many employers, the FHLBC has an escalating disciplinary action procedure in place to correct errant behavior in employees.  The steps of the escalating disciplinary action procedure are to issue a verbal warning, followed by a written disciplinary action, and, if the errant behavior is not corrected, termination of employment.  Regarding the preferential and inconsistent treatment of Ajshe Fejza (Caucasian female) in comparison to the treatment (termination of employment), which I received: everyone in the department was aware of Ms.Fejza's consistent subpar performance issues, which had been repeatedly occurring for a number of years.  However, I was unaware that Ms. Schweiters  had repeatedly issued verbal and written disciplinary actions to Ms. Fejza.  That is, until the day that Ms. Schweiters became extremely frustrated with Ms. Fejza's actions.  In response to her frustrations, Ms. Schweiters asked me for my advice as to how to manage the situation with Ms. Fejza. At this time, Ms. Schweiters informed me that Ms. Fejza had been repeatedly issued verbal and written disciplinary action. I would have continued to have no knowledge of these actions had Ms. Schweiters not informed me. Ajshe has also benefitted from additional training received from myself (see attached 2016 and 2016 Performance Appraisals), as well as others.  Ms. Fejza has benefited from FHLBC following escalating disciplinary actions procedures.  And, Ms. Fejza (Caucasian female) is still employed at the FHLBC.  However, my employment was immediately terminated, after one minor infraction (made under duress), which was the first and only such infraction made by me, during my term of employment. As demonstrated in comparison, in the submitted documents, I was an employee with acceptable performance. Therefore, I was the victim of not receiving the preferential treatment, by the FHLBC from which Ms. Fejza repeatedly benefitted.

**Conclusion**

In conclusion, the submitted documentation (emails, from internal and external stakeholders, performance appraisals, paystubs, etc.) verifies that Ms. Schweiters' initial attempt to discredit my professional reputation in March of 2016, in order to eventually end my employment, was discriminatory, based on my racial background, in conjunction with my sex (African American Male).  And, the termination of my employment, which was initiated by a disability related injury, in January of 2020 was in retaliation for the rescission of the March 2016 written disciplinary action, as well as Ms. Schweiters' discomfort with me being an African American Male.

Thank you for your consideration.

Robert E. Jackson